MICHAEL J. ESLER AND MARCIA E. LORENZEN, FORMERLY MARCIA E. ESLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ERIC R. HAESSLER AND ALICE A. HAESSLER; ROBERT P. JOHNSON AND JANICE L. JOHNSON; ROGER T. TILBURY AND MARGARET M. TILBURY; AND JACK R. PLATTEN AND ESTATE OF CAROL E. PLATTEN, DECEASED, JACK R. PLATTEN, PERSONAL REPRESENTATIVE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Esler v. Commissioner
Docket Nos. 43336-85; 45875-85.
United States Tax Court
T.C. Memo 1988-417; 1988 Tax Ct. Memo LEXIS 448; 56 T.C.M. (CCH) 41; T.C.M. (RIA) 88417; September 1, 1988. Joyle C. Dahl, for the petitioners in docket No. 43336-85. Ronald H. Hoevet and Leslie L. Wellman, for the petitioners in docket No. 45875-85. Christine V. Olson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Petitioner
1979
1980
1981
Michael J. Esler and Marcia E. Lorenzen,
$ -0-
$ 11,190
$ 1,349
formerly Marcia E. Esler
Eric R. Haessler and Alice A. Haessler
$ 1,838
$ 4,694
$ 1,933
Robert P. Johnson and Janice P. Johnson
$  -0-
$  -0-
$ 1,762
Roger G. Tilbury and Margaret M. Tilbury
$ 1,662
$ $ 6,630
$  -0-
Jack R. Platten and Estate of Carol E.
$ 1,092
$ 3,268
$  -0-
Platten, Deceased, Jack R. Platten,
Personal Representative
Jack R. Platten
$ -0-
$ -0-
$ 1,730
*451 The issue for decision is whether certain payments received by petitioner Michael A. Esler during 1979, 1980 and 1981 on his withdrawal from a law firm constituted payments for his interest in partnership property, taxable to him as capital gain under section 736(b), [1] or "guaranteed payments" which constituted a liquidation of his interest in the partnership, taxable to him as ordinary income under section 736(a)(2) and deductible by the firm in computing its ordinary income. FINDINGS OF FACT All petitioners in these consolidated proceedings were legal residents of Oregon when the petitions were filed. For several years prior to 1976, Howard Stamer (Stamer) was "of counsel" and petitioner Eric R. Haessler (Haessler) was a partner in the law firm of Keane, Haessler, Harper, Perlman & Copeland in Portland, Oregon. Petitioner Michael J. Esler (Esler) was an associate in the firm. Haessler and Stamer decided to withdraw and form a firm of their own. At about the same time, Esler had also decided to withdraw. Stamer learned of Esler's plan to withdraw and approached *452 him in regard to joining the new firm. Esler and Stamer worked out an arrangement for Esler to become a member of the new firm. On or about February 1, 1976, Esler, Haessler, and Stamer entered into an oral agreement to form a partnership known as Haessler, Stamer, and Esler (Partnership I) to engage in the practice of law in Portland, Oregon. No written partnership agreement was prepared to govern any of the rights and obligations of the parties. Haessler's and Stamer's interests in the partnership were fixed at 42.5 percent each and Esler's interest at 15 percent. On September 30, 1978, petitioner Roger Tilbury (Tilbury) and Jack Rosen (Rosen) entered Partnership I and the name of the firm was changed to Haessler, Stamer, Tilbury, and Esler (Partnership II). Drafts of a written partnership agreement were prepared for Partnership II but no written agreement was executed. Upon the formation of Partnership II, Esler's partnership interest increased from 15 to 19 percent and Haessler and Stamer's partnership interests decreased from 42.5 to 22 percent. Subsequently, petitioner Jack R. Platten (Platten), who started working for the firm in the latter part of 1976, became a partner *453 in the firm. In February of 1977 Alan Schneider (Schneider) joined the firm as an associate. In addition to practicing law, Haessler and Stamer during the life of Partnerships I and II engaged in entrepreneurial and business investment activities outside of the law practice. Haessler was involved with Northwest Hardwoods, Inc., Omega Securities, Inc., and Webster Ford. He was chairman of the board of Northwest Hardwoods, and he and his family members had been the largest shareholders of Northwest Hardwoods for years. Northwest Hardwoods was the largest hardwood lumber company in the United States. Haessler received compensation of $ 48,000 per annum from Northwest which he paid over to the law firm. The firm also received fees from Webster Ford. Stamer was involved in such ventures as Downtown Athletic Club; Nancy Lee, Inc.; Love-it Ice Cream Company; and Agoil, Inc., among others. Haessler and Stamer's business relationships directly and indirectly produced a large part of the law firm's business. Stamer developed Agoil, Inc., during 1977 and 1978, while Haessler, Esler, and Stamer were partners. Agoil was organized as an oil exploration operation in Victoria, Texas; it *454 was expanded to include a conglomeration of corporations and a vehicle for the syndication of about 15 limited partnerships. On September 30, 1979, the approximate date of the settlement agreement between petitioner and the other partners, its book value was in excess of $ 600,000. The firm did not bill Agoil for the time Stamer spent developing Agoil but billed Agoil and other similar enterprises for the services performed by other attorneys in the firm. In the latter part of 1977, Esler and Stamer became involved in Portland Workout Corporation (PWOC), a business venture in which they purchased assets from the B. P. John Furniture Company in Portland and liquidated those assets for profit; they shared the income realized from PWOC among themselves and other individuals without making any distribution to the law firm. When PWOC was sold, Esler reported his profit as long-term capital gain on his individual tax return. Haessler generally followed the same pattern with respect to his own business ventures. In about November or December 1978, Esler decided that he wanted to withdraw from Haessler, Stamer & Esler partnership. While both Esler and Haessler were in New York on business, *455 they discussed Esler's withdrawal. Esler originally demanded $ 125,000 for his interest in the partnership. Haessler said that $ 75,000 was more reasonable. No settlement was reached at this meeting. In March 1979 Esler submitted his notice of intent to withdraw from this partnership. Thereafter, Esler and other attorneys physically set up new offices. Esler transferred his client files and work in progress to the new offices. The partnership did not pay Esler any money upon withdrawal. Effective May 15, 1979, the parties formally dissolved the law partnership. As of that date, Haessler, Stamer, Tilbury, Rosen and Platten (sometimes hereafter the Haessler group) continued the practice of law under the firm name of Haessler, Stamer & Tilbury in the offices of the former partnership. Esler joined with Alan L. Schneider, who previously had worked in the firm, in the practice of law under the firm name of Esler & Schneider at a different location. The Haessler, Stamer, Tilbury and Esler law firm's balance sheet as of March 31, 1979, when Esler submitted his notice of withdrawal, shows the following: Assets
Cash Accounts
$  11,601
Accounts Receivable
68,807
Advanced Costs
11,307
Office Equipment, Furniture,
library and leasehold
improvements less accumulated
depreciation
49,559
Investments
9,100
Total Assets
$ 150,374
Liabilities
Payroll taxes
$ 4,540
Notes payable
99,402
Investment contract
liabilities
1,199
Total Liabilities
$ 105,141
Net Equity
Total Assets Less Total Liabilities
$  45,223
*456 Notes to this balance sheet show that, as to accounts receivable, "Net amount is the gross amount less all receivables of clients with a balance that is greater than 90 days old" and that the item for investments "Does not include disputed claims to various Stamer & Haessler business ventures." In June 1979 Esler filed a complaint against Haessler, Tilbury, Platten, Stamer, and Rosen in the Circuit Court of the State of Oregon for Multnomah County; in August 1979 Esler filed an amended complaint. Esler's amended complaint alleged, among other things, that Stamer and Haessler had converted certain property and assets of the partnership, and requested an accounting. To resolve the lawsuit, a settlement agreement was entered on October 30, 1979. The agreement recites that it was made by and between Esler, Schneider, Haessler, Stamer, Tilbury, Rosen and Platten. It states that the parties "desire to resolve the dissolution of the partnership of Haessler, Stamer, Tilbury & Esler and other predecessor firms, to settle all claims between themselves with regard to the Firm and the predecessor firms and to compromise their differences." The agreement states that as of May 15, 1979, Haessler, *457 Stamer, Tilbury, Rosen and Platten continued the practice of law under the firm name of Haessler, Stamer & Tilbury which is referred to in the agreement as the "Firm." The agreement provides: 1. Distribution of Assets
Firm shall pay to Esler the sum of $ 67,000 which shall be paid as follows: $ 10,000 shall be paid out of the first proceeds collected for the Firm pursuant to Exhibit A, attached hereto and incorporated herein by reference. The remaining $ 57,000 shall be paid in equal monthly installments without interest, the first installment of $ 2,777.72 to be due October 30, 1979, and a like installment of $ 2,777.78 on the fifteenth day of each month thereafter until such balance is paid in full.
The agreement authorizes the Firm to bill certain clients for services performed prior to May 15, 1979, and Esler to bill such clients for services performed after that date. Exhibit A, referred to in the above-quoted paragraph, set forth the manner in which the fees collected from those clients were to be divided. The Firm agreed to hold Esler harmless and indemnify and protect him from any and all notes, accounts payable, and other obligations of the Firm. The partnership *458 returns of Haessler, Stamer and Tilbury for 1979, of Haessler, Tilbury and Platten for 1980 and Haessler, Platten and Johnson for 1981 show "guaranteed payments" to Esler as follows: 1979
$ 15,570
1980
33,333
1981
12,557
These payments were made in installments by checks drawn on the firm's account. The amounts of the payments were subtracted from the income shown on the returns in computing the ordinary income of the partnership. Neither the returns for 1979, 1980 and 1981 nor the returns for 1976, 1977 and 1978 contain any references to any business activity other than the practice of law. [2]
Esler's individual income tax returns for 1979, 1980 and 1981 reported 96.69 percent of the foregoing payments received from the law firm as capital gain. His income tax return for 1981 contains the following explanation:
Installment Sales Computation Sale of 19% interest in Haessler, Stamer & Tilbury partnership. Acquired 2/76 and sold 5/15/79. Gross sales price
$ 67,000
Total cost/Adj. Basis
2,219
Adjusted cost
$ 64,781
Gross profit percentage
64,781 divided by 67,000
.9669
*459 Taxable
Year
Total
Ratio of
Taxable
Ended
Payments
Profit
Portion
12/31/79
$  5,333
.9669
$  5,187
12/31/80
$ 42,262
.9669
$ 40,863
12/31/81
$ 12,556
.9669
$ 12.140
In the notice of deficiency issued to Esler, respondent determined that the payments made to him by the law firm were made in connection with a liquidation rather than a sale of a partnership interest and, therefore, the amount received is ordinary income rather than capital gain. To protect the revenue, the notices of deficiency issued to the other petitioners in these proceedings made the inconsistent determination that deductions by the law partnership for guaranteed payments to Esler were not allowable because the amounts of the payments were made in connection with a sale rather than a liquidation of his partnership interest. OPINION Esler and the Haessler group have taken inconsistent positions as to tax treatment of the $ 67,000 paid Esler following his withdrawal from the law firm. Esler now concedes that, upon his withdrawal from the firm, he did not sell his partnership interest as such within the meaning of section 741. See Cooney v. Commissioner,65 T.C. 101 (1975). *460 He contends, however, that the $ 67,000 was paid in exchange for his interest in partnership property under section 736(b)[3] and was, therefore, taxable to him as long-term capital gain rather than ordinary income. The Haessler group maintains that the payments to Esler were guaranteed payments under section 736(a)(2), and not payments under section 736(b). They thus contend the partnership properly deducted the $ 67,000 as a business expense. As stakeholder, respondent argues only that Esler and the Haessler group should treat the liquidation payments consistently. *461 Section 736 and the regulations thereunder prescribe specific rules on the treatment of liquidation payments by a partnership to a withdrawing partner. In applying these rules, liquidation payments must be classified as either: (1) section 736(b) payments or (2) section 736(a) payments. Sec. 1.736-1(a)(2), Income Tax Regs.[4]
Section 736(b) payments generally are liquidation payments made by the partnership to purchase the withdrawing partner's interest in the partnership's property. Under section 736(b)(2), however, section 736(b) payments do not include amounts paid for the partnership's *462 "unrealized receivables" or amounts paid for the partnership's goodwill in excess of its partnership basis, unless the partnership agreement provides for a reasonable payment for goodwill. Secs. 1.736-1(b)(2) and (3), Income Tax Regs. Because the oral partnership agreement in this case did not deal with goodwill, any payments attributable to goodwill on dissolution of the partnership would fall within section 736(b)(2) and would not be section 736(b) payments. Section 736(b) payments are considered a distribution by the partnership. Thus, except to the extent the partnership had substantially appreciating inventory so that section 751(b) is applicable, the withdrawing partner's gain or loss from the sale of his interest in partnership property is determined under section 731. Sec. 1.736-1(b)(6), Income Tax Regs. Because any such gain or loss recognized under section 731 is considered as gain or loss from the sale or exchange of the withdrawing partner's partnership interest, it is a capital gain or a capital loss. Sec. 731(a); sec. 1.731-1(a)(3), Income Tax Regs. *463 Correspondingly, no deduction is allowed to the partnership or the remaining partners for the section 736(b) payments because such payments represent either a distribution or a purchase by the partnership of the withdrawing partner's capital interest. Sec. 1.736-1(a)(2), Income Tax Regs.
Those liquidation payments which are not section 736(b) payments are section 736(a) payments. Section 736(a) payments are treated: (1) as a distributive share of partnership income where determined with regard to the partnership's income or (2) as "guaranteed payments," defined in section 707(c) to include payments "determined without regard to the income of the partnership * * * to a partner for services or the use of capital." Section 736(a) payments which are considered a distributive share of partnership income are taken into account under section 702 in the income of the withdrawing partner, thereby reducing the partnership income to be reported by the remaining partners. Section 736(a) payments which are guaranteed payments are deductible by the partnership as a business *464 expense and are taxable as ordinary income to the withdrawing partner. Sec. 1.736-1(a)(4), Income Tax Regs.
Esler contends that Haessler, Stamer, and he agreed that the partnership they created on February 1, 1976, would engage in two businesses, the practice of law and the development of business ventures. Haessler and Stamer were each to have 42.5-percent ownership interests and Esler was to have a 15-percent interest. Esler maintains that the $ 67,000 he received on withdrawing from the partnership was his compensation for his 15-percent interest [5] in certain property and assets accumulated by the partnership, mainly for his interest in the stock of Agoil, which he describes in his brief as "a successful business venture developed primarily by Stamer while he was in partnership with Haessler and Petitioner [Esler]." The Haessler group maintains that the partnership covered only the practice of law. Stamer and, to a lesser extent, Haessler engaged in a variety *465 of business activities which produced legal work for the firm but they argue that Esler had no capital interest in those businesses. Accordingly, they contend, none of the $ 67,000 constituted compensation to Esler for any business assets. Although the oral testimony is conflicting, we think its most reasonable interpretation favors the Haessler group. As we view the evidence, Esler decided to withdraw from the firm because he felt that he performed a disproportionate part of the firm's income-producing legal work while Stamer and Haessler devoted much of their time to private business endeavors. The $ 67,000 payment was designed to compensate Eslerfor income, accounts receivable and work in progress retained by the firm and for the firm's goodwill or going concern value that Esler had help build through his past services. Under the settlement agreement, $ 10,000 of the $ 67,000 was expressly related to the first amounts collected "for the Firm" on specifically described accounts receivable. In fact, the record shows that Esler received direct payments of $ 7,958.92 and $ 2,041.08, a total of $ 10,000, from named clients; this $ 10,000 was taxable to him as his "distributive *466 share" of partnership income. Sec. 736(a)(1). Also included in the $ 67,000 was a Keogh account adjustment; the firm failed to make a timely $ 7,000 contribution to the plan and, as part of the settlement, included this amount in the installment payments. The installment payments made to discharge the $ 57,000 over and above the named accounts receivable were, in our view, "guaranteed payments" determined without regard to the income of the partnership within the meaning of section 736(a)(2). A number of circumstances, as well as the testimony of Haessler, Platten and Tilbury, support our factual conclusions with respect to the $ 57,000 the firm paid Esler in installments. The settlement agreement states that the parties, who included Haessler, Stamer, Tilbury, Platten, Esler, and Esler's new partner, Schneider, had engaged "in the practice of law in Portland, Oregon, as a partnership." The agreement makes no reference to any business activities other than the law practice in which Haessler or Stamer were involved. If the $ 57,000 had constituted payments for Esler's interest in businesses standing in Stamer's name, it seems only reasonable that the agreement would have identified *467 those business interests. Because it did not do so, the inference is that the agreement related only to the law practice. Moreover, the settlement agreement obligated the law firm, described therein as consisting of Haessler, Stamer, Tilbury, Rosen, and Platten, rather than only Haessler and Stamer, to make the payments to Esler. Compare Karan v. Commissioner,319 F.2d 303, 307 (7th Cir. 1963), affg. a Memorandum Opinion of this Court. Consistent with that obligation, the 1979, 1980, and 1981 partnership returns of the law firm show "guaranteed payments" to Esler of $ 15,570 (plus ordinary income of $ 3,985) for 1979, $ 33,333 for 1980, and $ 12,557 for 1981. The record also shows that checks covering the payments to Esler were drawn on the firm's account. Esler's own testimony states that Tilbury and Rosen entered the law firm in late 1978, several months before he withdrew from the firm, and that they received no interest in any businesses developed by Haessler and Stamer. Yet, according to the partnership returns, Tilbury's and Rosen's proportionate shares of the firm's earnings were reduced by the payments to Esler. It seems hardly reasonable that Tilbury *468 and Rosen would pay Esler part of the value of property retained by Stamer or Haessler. Furthermore, there are no clues in the partnership returns introduced in evidence indicating that the partnership engaged in any other business than the practice of law or owned any business property unrelated to the law practice. Although the law firm's 1976, 1977 and 1978 returns were not offered in evidence, the testimony indicated that they did not contain entries regarding the various business activities in which Esler argues the partnership engaged. If businesses organized by Stamer and Haessler were, in fact partnership endeavors, the income, losses, sales and other transactions with respect to those businesses would, in the ordinary case, have been reflected in the returns. Bearing in mind this partnership was composed of lawyers, it seems only reasonable that they would have known that the partnership returns should have reflected the gains or losses derived from any business activities in which the firm engaged. In fact, in the latter part of 1977, as detailed in our findings, Esler and Stamer took over a business which was in bankruptcy and established an organization known as Portland *469 Workout Committee. Haessler did not participate in this venture. Esler and Stamer ultimately sold the business in early 1978 for a profit. Esler admitted that the gain on this venture was treated as individual capital gain and was not reported on the partnership return. The record contains no convincing explanation why this business venture was not owned by the partnership if Agoil, for example, was a partnership venture. Other circumstances support our conclusion. The paragraph of the settlement agreement quoted in our findings expressly states that no interest was to be paid on the installments payable to Esler. Ordinarily, deferred payments for the purchase of property bear interest. Further, when the settlement agreement was negotiated, Platten and other partners, as well as Stamer and Haessler, participated in the negotiations. Unless the interests of the remaining partners were affected by the amount of the payment, there would have been no real reason for their participation in the negotiations. Haessler's investments in Northwest Hardwoods, moreover, were made by him and his family years before he formed the firm with Esler. He lent his personal credit to some of *470 the other ventures. Haessler's compensation from Northwest Hardwoods was turned over to the firm but he expressly denied any transfer of his investment in that company or any other company to the firm. There is no evidence to the contrary. Esler contends that none of the payments can be attributed to goodwill. He maintains that, when he left the firm, he took with him essentially the entire litigation department. In effect, he argues, he took his goodwill and the firm kept its goodwill. "Goodwill has been defined as the probability that 'old customers will resort to the old place' without contractual compulsion." Karan v. Commissioner,319 F.2d 303, 306 (7th Cir. 1963), affg. a Memorandum Opinion of this Court. Significantly, when Esler left the firm, the only change made in its name was to drop Esler's name. We think that some of the firm's clients for whom Esler had performed services would first contact the firm's offices and that the quality of Esler's past performance would be of at least an initial advantage to the firm in obtaining new clients and retaining old ones. In other words, the $ 57,000 paid in installments in part compensated Esler for the *471 firm's going concern value and goodwill which he relinquished. We recognize that bona fide misunderstandings often arise with respect to the terms of oral partnership agreements. Also, where some of the partners in a law firm engage in business ventures as well as the practice of law, disputes may arise, particularly where, as in this case, the firm performs legal services related to those business ventures. As we view the evidence before us, however, it does not support Esler's contention that the $ 67,000 was payment for partnership property within the meaning of section 736(b). Accordingly, the $ 67,000 is taxable to Esler as ordinary income and the disallowed guaranteed payments are deductible by the surviving law firm. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated. ↩
2. Esler testified that income from Great Studio Graphics may have been reported on the 1979 return, but we find no reference to that organization on the return. ↩
3. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered -- (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) Payments For Interest in Partnership. -- (1) General Rule. -- Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) Special rules. -- For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for -- (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will. ↩
4. Sec. 1.736-1(a)(2), Income Tax Regs., in pertinent part, states: When a partnership makes such payments, whether or not related to partnership income, to retire the withdrawing partner's entire interest in the partnership, the payments must be allocated between (i) payments for the value of his interest in assets, except unrealized receivables and, under some circumstances, good will (section 736(b)), and (ii) other payments (section 736(a)↩). * * * 5. As noted in our findings, Esler's 1981 income tax return reports a sale of a 19-percent interest in the partnership but his testimony describes his interest as a 15-percent interest. ↩